UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| SPINAL IMAGING, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 09-11873-LTS |
| | ) | |
| AETNA HEALTH | ) | |
| MANAGEMENT LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| RADIOLOGY DIAGNOSTICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 12-11521-LTS |
| | ) | |
| AETNA HEALTH | ) | |
| MANAGEMENT LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

August 21, 2014

SOROKIN, D.J.

This dispute involves claims made by two companies that provide radiological services, Spinal Imaging, Inc. and Radiology Diagnostics, LLC, against two insurer-defendants, Aetna Health Management LLC and Aetna Life Insurance Company. A bench trial was held over the course of four days beginning on July 7, 2014. The following sets forth the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52 on each plaintiff's Chapter 93A claim.

I.      PROCEDURAL HISTORY

This case involves two separate actions that were informally consolidated for discovery purposes and formally consolidated for trial.  In the first action, plaintiff Spinal Imaging, Inc. ("Spinal") sued both defendants (collectively, "Aetna") in Massachusetts state court for breach of contract and violations of Chapter 93A of the Massachusetts General Laws.  In the second action, plaintiff Radiology Diagnostics, LLC ("RD") sued Aetna also in Massachusetts state court, alleging breach of contract, violations of Chapter 93A, and negligence.  Both cases eventually were removed to this Court.

Collectively, plaintiffs' claims arise out of approximately 12,000 individual bills submitted to Aetna for payment between 2003 and 2012, each bill seeking payment for the interpretation of one or more x-rays of an individual patient.  In the course of discovery, the Court determined that the several legal claims would be resolved on the basis of a selection of individual bills ("the exemplars"), with the resolution of the exemplars then applied to the remaining bills.  See Doc. Nos. 84, 87, 192.  In response to cross-motions for summary judgment, the Court entered judgment in Aetna's favor on both plaintiffs' breach of contract claims, RD's negligence claim, and, regarding both plaintiffs' Chapter 93A claims, all but eleven of the exemplar bills.  Doc. Nos. 153, 156, 163.  The bench trial focused on the remainder of the Chapter 93A claims.

II.     FINDINGS OF FACT

Spinal's Business Model

1.      Spinal is a Maine corporation founded by Bruce Abelson, D.C. to provide radiological services for chiropractors.  At all relevant times, Dr. Abelson has owned all of Spinal's stock.

2.     Dr. Abelson believes his training, obtained in chiropractic school, to read x-rays and other radiological images was only "rudimentary."  Thus, he conceived of the idea to form a business staffed by a chiropractic radiologist—a chiropractor who had completed an additional three-year radiological residency and obtained board certification—who would read and interpret x-rays taken by chiropractors.  Spinal resulted; it was formed in 1991.

3.     Spinal advertised itself as performing "second opinions" for chiropractors, explaining that these "second opinions" would provide better interpretations of x-rays, more patient referrals for the referring providers, and better protection from possible malpractice liability.  Ex. 109 at 542; Ex. 111 at 204-05.[1]  It also touted its services as "no cost" to the chiropractor because Spinal would bill the insurance company directly.  Ex. 109 at 536; Ex. 111 at 204.  Spinal encouraged referring chiropractors to send every x-ray they took to Spinal for interpretation and analysis.  Ex. 109 at 536-37; Ex. 111 at 205.  Spinal also explained to the referring chiropractors that Spinal's written report could be submitted to insurance carriers "in place of, or in addition to their own reports."  Ex. 111 at 208.

4.     When a chiropractor referred the x-rays of a patient to Spinal, the chiropractor completed a one-page referral form created by Spinal which sought basic information regarding the patient, the patient's health insurance information, and any pertinent medical information. The chiropractor also obtained the patient's signature on a one-page consent/assignment form on the reverse side of the referral form, which authorized Spinal to bill the patient's insurance company and explained that the patient's x-rays were being submitted to Spinal "for second opinion radiological evaluation and analysis by a specialist."  See, e.g., Ex. 1.  Finally, the

---

[1] When citing to trial exhibits, the Court, for clarity of reference, will cite to the last three digits of the Bates number of a page when available and appropriate.

chiropractor mailed, usually via FedEx and always at Spinal's expense, the two-sided form and films to Spinal.

5.      When Spinal received the package, it created its own internal documents regarding the referral. Spinal never verified that the patient possessed insurance, that the patient's insurance covered chiropractic x-rays, that any required referrals or precertifications had issued, or that the applicable insurance, if any, would otherwise cover the services Spinal intended to render.

6.      After Spinal's staff opened an internal file, Spinal's chiropractic radiologist examined the films and prepared a written radiological report of his findings. Spinal would also "digitize" the x-ray—a process in which measurements and angles of the spine are taken and compared to a "normal" spine. After digitization, a visual, comparative report of the patient's spine was created to accompany the written radiological report. Spinal then mailed the films and reports back to the referring chiropractor and billed the patient's insurance company.

7.      If the insurance company did not pay Spinal, Spinal's administrative staff followed up with the insurance company by phone or fax, supplying additional information or refiling paperwork.

8.      Spinal's staff never filed any written appeals of any payment denials by Aetna.[2] Spinal's staff never reviewed the terms of, or any provisions of, any insurance policy issued by Aetna. Spinal's staff never reviewed any of Aetna's claim processing policies available on Aetna's publicly accessible websites.

---

[2] To be clear, some number of appeals were filed later, around 2010. See note 5, infra. Those appeals, however, were filed in reference to claims made by RD and not Spinal.

<u>Insurance Companies' Treatment of Spinal's Claims</u>

9.      From Spinal's inception in 1991 until approximately 2002, the business

prospered.  By 2002, Spinal employed twenty-two people.  In 2002 or 2003, however, a number

of insurance companies, including Aetna, began questioning Spinal's bills and/or denying its

claims for reimbursement.  The basis for these denials and the insurance companies' specific

concerns are not before the Court.  The substance of the insurance companies' complaints, in

whole or in part, was that they were paying Spinal to interpret an x-ray after having paid the

referring chiropractor to interpret the same x-ray.  Specifically, at some point in 2003, Blue

Cross complained that Spinal could not bill for interpreting an x-ray when the referring

chiropractor also billed Blue Cross for interpreting that same x-ray.  Ex. 138 at 789.

10.     During the time period relevant to these actions, the health insurance company

with whom Spinal filed the most claims was Blue Cross Blue Shield.  Aetna was one of the top

four health insurers with whom Spinal did business, in terms of the number of claims filed.

<u>Aetna's Requirements for X-ray Reports</u>

11.     The parties dispute the tasks a provider must perform in order to receive

reimbursement from Aetna for interpreting an x-ray.  This dispute underlies plaintiffs' assertion

that they did not render second opinions.  According to plaintiffs, a provider is not entitled to

reimbursement for interpreting an x-ray unless the provider prepares a full written report

detailing the findings of the interpretation.  Plaintiffs fail to cite to any expert opinion evidence

in support of this assertion.[3]  They also fail to identify any Aetna claim processing policy or a

provision of any Aetna insurance policy that supports their position.

---

[3]  Plaintiffs attempted to offer expert opinions from both Dr. Abelson and Dr. Henry, plaintiffs' chiropractic
radiologist.  Aetna, however, objected to the testimony on the ground that plaintiffs had failed, at any point, to make

12.     Aetna's witness, Kim Lajoie, has worked for Aetna for many years as a customer service representative, leader of customer service teams, and an investigator in Aetna's Special Investigations Unit ("SIU").  She testified that, from Aetna's perspective, a provider is entitled to reimbursement if it both performs the service—in this case, the interpretation of the x-rays—and documents the service in writing in the insured's medical records by at least noting the performance of the service and the findings.  Ms. Lajoie was a forthright, credible witness with years of experience who testified candidly and specifically.  I credit and accept her testimony on this point.

13.     While plaintiffs point to an email from a medical director at Aetna stating that a "formal written report" is required, at least as to one billing code for reimbursement of x-ray consultations, Ex. 103, the record is devoid of evidence fleshing out the meaning of "formal written report" beyond the testimony of Ms. Lajoie and Dr. Abelson.  Dr. Abelson cannot testify as an expert witness on this point.  See note 3, supra.  In addition, Dr. Abelson has no basis to testify regarding Aetna's requirements for reimbursement, as he admits he has never read any Aetna health insurance policies nor any Aetna claim processing policies.  Thus, I credit and accept Ms. Lajoie's testimony as to what, as a factual matter, is sufficient to support a claim for reimbursement from Aetna.

The Knowledge and Understanding of Spinal and Dr. Abelson

14.     Dr. Abelson and Spinal deny they knew or understood that the referring chiropractors were interpreting the x-rays, creating x-ray reports, and billing for the interpretation of x-rays.  I reject this testimony as wholly incredible.

---

any of the required expert disclosures.  Accordingly, the Court allowed Aetna's motion in limine, Doc. No. 186, to exclude such testimony.

15.     Dr. Abelson and Spinal knew, no later than the beginning of 2003 and in all likelihood since 1991, that health insurance companies do not pay twice for the performance of the same service absent an individualized showing of medical necessity.[4] Thus, they understood that Aetna ordinarily would not pay for Spinal to interpret an x-ray and prepare a report if the referring chiropractor already had done so.

16.     Dr. Abelson conceded he knew and understood that the referring chiropractors would take x-rays, examine the films, and make treatment decisions based upon this interpretation. He also knew and understood that these chiropractors generally would memorialize their work in written medical records, including x-ray reports. That the chiropractors would and did bill for this service is obvious; Dr. Abelson understood this, and Spinal is charged with Dr. Abelson's knowledge. Moreover, neither Dr. Abelson nor Spinal instructed referring chiropractors not to bill for interpreting the x-rays. They did not issue such a request or instruction, nor did they check to see if such billing had occurred, because they knew and understood that doing so would reduce the referring chiropractors' income and make those chiropractors less willing to refer films to Spinal for interpretation.

17.     Dr. Abelson and Spinal also knew and understood that the referring chiropractors were documenting their interpretations sufficiently to support billing the insurance companies for interpreting the x-rays. Spinal explained to the chiropractors in its marketing materials that Spinal's reports could be submitted "in place of, or in addition to [the chiropractors'] own reports." Ex. 109 at 543. In addition, neither Dr. Abelson nor Spinal ever told any referring chiropractor that billing the insurance company for an x-ray interpretation required a multiple

_____
[4]   Plaintiffs make no claim that the particular circumstances of any individual case warranted a second review of an insured's x-rays.

page written x-ray report akin to Spinal's reports. While Dr. Abelson now maintains that the referring chiropractors were committing insurance fraud if they billed for an x-ray interpretation without a detailed written report, he never voiced that opinion to the referring chiropractors. To the contrary, Dr. Abelson and Spinal encouraged the referring chiropractors to continue business as usual and, indeed, to send <u>every</u> x-ray to Spinal for a second opinion, <u>see, e.g.</u>, Ex. 111 at 205.

18.     Spinal's conduct from 2003 to 2008 (and beyond) confirms the foregoing factual findings. In the face of hundreds and then thousands of claim denials by Aetna beginning in 2003, Spinal never appealed, never sought a formal meeting with Aetna, never declined a referral from one of Aetna's insureds, and never made any effort to verify the insurance coverage of any of Aetna's insureds. Further, Spinal never asked or instructed the referring chiropractors to refrain from billing for x-ray interpretation, and Spinal never made any effort to determine, either from Aetna or the referring provider, whether the referring provider already had billed for interpreting the x-ray. Put another way, at no time from Spinal's birth until 2008 did Dr. Abelson or anyone else from Spinal advise or instruct referring providers not to bill globally, that is, not to bill for both taking and interpreting the x-ray. In addition, upon receipt of a referral, Spinal did not ask whether the referring chiropractor had billed or would bill under the global code. Nor, after its claim was filed, did anyone from Spinal ever check to determine whether the referring chiropractor had billed under the global code.

19.     Spinal undertook none of these actions because to do so would have threatened the income of the referring chiropractors and discouraged them from referring films for interpretation. Dr. Abelson understood that referring chiropractors would have been less likely to refer to Spinal if they could bill only for taking the x-ray, and not for taking <u>and</u> interpreting the x-ray. Spinal understood that referring chiropractors would receive less in reimbursements

8

from Aetna if they ceased billing under the global code. Spinal's business model depended upon providing a service at no cost to the referring chiropractor, requiring no effort beyond placing every film in a prepaid envelope addressed to Spinal. For these reasons, Spinal continued to process and interpret thousands of x-rays of Aetna insureds while knowing it generally would not receive payment from Aetna.

20.     Finally, for four of the five remaining exemplars arising from Spinal's bills, Spinal sought payment using CPT code 76140, which, per Aetna's publically available policy in effect since 2000, is a code used for "consultations on radiology reports for x-rays performed elsewhere." Ex. 42. Because that code is distinct from the codes used for either taking an x-ray or performing the initial interpretation of that film, the use of the code reasonably indicated, to Aetna at least, that Spinal was billing for second interpretations of x-rays taken and initially interpreted elsewhere. In other words, Spinal's billing mirrored its own website, advertisements, and assignment form in explaining that it was in the business of rendering second opinions.

21.     Accordingly, I find that Spinal knew, no later than 2003, that referring providers were, in fact, billing for taking <u>and</u> interpreting x-rays before sending the films to Spinal for further analysis and report. Spinal knew and understood that it was in the business of rendering second opinions.

<u>Aetna's Early Investigations into Spinal's Claims</u>

22.     Aetna had investigated Spinal's billing practices beginning as early as 1995. Ex. 92; Ex. 95 at 253. At all relevant times, the investigations into Spinal and RD's billing and business practices were conducted by Aetna's SIU.

23.     From 2000 through 2002, the SIU investigated claims it was receiving from Spinal. Ex. 52. Before that, Aetna already had concluded that Spinal was billing for second

interpretations of routine chiropractic x-rays without those second opinions being medically necessary. Id. at 072. The investigation included contacting Aetna insureds as early as 2001 to verify the services Spinal had rendered, id.; Exs. 93-94, and contacting Aetna medical directors—medical practitioners on Aetna's staff who consult on issues including medical necessity—as early as 2002, Ex. 52 at 074; Ex. 103. This consultation included seeking input from medical directors specializing in chiropractic and billing codes.

24.     Before this investigation, Aetna had placed a flag on Spinal claims intended to prevent such claims from being paid without receiving medical records and verifying medical necessity for the second interpretation of an x-ray. Ex. 52 at 072. The investigation was closed in 2002, with the flag left in place and Aetna confident that additional action was not needed at that time. Id. at 074.

25.     This flag did not result in the denial of all Spinal claims prior to 2003. The reason for the flag's initial inefficacy is unclear, but that question need not be resolved, as the claims at issue in these cases were filed beginning in 2003.

The Individual Exemplar Claims and the Relevant Activity from 2003 Onward

*2003*

26.     Aetna's reimbursement practice changed dramatically in 2003. Previously, it had paid many Spinal claims. In 2003, Spinal submitted 1,569 claims, and Aetna paid only 430, or approximately twenty-seven percent, of those claims. Ex. 123. Exemplar claims in 2003 were denied for various reasons, including that they were not medically necessary and lacked necessary referrals. Ex. 125.

27.     Spinal personnel followed-up on the unpaid claims by calling Aetna or submitting additional information if Aetna indicated information was missing. If a claim was denied for not

being medically necessary, Spinal employees would send a form letter, authored by Dr. Henry, that explained in general terms the medical necessity of his interpretation, grounded in the assertion that he was substantially more qualified than an ordinary chiropractor to interpret x-rays.  Ex. 59 at 216-17.

28.     Exemplar Claim 2003-7 was filed in 2003 on behalf of Patient DR and is one of the eleven exemplars remaining.  Ex. 2.  Spinal received an Explanation of Benefits ("EOB") in January 2004 which stated that the claim was being denied because "[t]his charge appears to be a duplicate. [Aetna's] records show that [it] ha[s] previously processed this claim."  Ex. 2.  Although not stated in the EOB, Patient DR's plan required a referral from a primary care physician in order to receive coverage for services not provided by the primary care physician.  Ex. 3 at 493.  There is no evidence that a referral was ever issued, let alone received by Aetna.

29.     In 2003, Aetna commenced another investigation into claims filed by Spinal, apparently with a view towards recovering amounts paid to Spinal for services that Aetna considered not properly payable.  Ex. 138 at 787.  During 2003, as part of the investigation, an SIU investigator reviewed Spinal's website and added it to the SIU file.  Id.; Ex. 111.  At that time, the website indicated that Spinal provided second opinions, rendered its services at no cost to the referring doctor, and provided written reports that could be provided to insurance companies "in addition to [the referring provider's] own reports."  Ex. 111 at 204-05, 208.  The investigation records also reflect that an Aetna medical director reviewed several Spinal claims and determined they were not medically necessary.  Ex. 138 at 787.

*2004*

30.     By 2004, Spinal knew Aetna had denied about three-fourths of its 2003 claims.  Spinal, however, did not stop accepting referrals from Aetna insureds.  Nor did Spinal seek to

determine before providing its services whether Aetna insureds' policies covered such services. Spinal accepted 1,958 referrals of films taken of Aetna insureds in 2004, and of these claims, Aetna paid only 215, or almost eleven percent. Ex. 123. The 2004 exemplars show Aetna denied these claims due to lack of a required referral, and the service not being covered by a member's plan, among other reasons. Ex. 125.

31.     At least one claim was denied in 2004 with no reason being given on the EOB except for a notation stating a letter would be sent providing further explanation. Ex. 125. It is undisputed that throughout the time period relevant to this case, Aetna sent numerous EOBs that denied claims without offering explanation beyond the statement that there would be a "letter to follow." It is also undisputed that Aetna never sent the letter to follow.

32.     Spinal never filed a formal written appeal of any claims submitted in 2004. Spinal employees testified that they would call Aetna to inquire when they received a "letter to follow" EOB, when the claim was denied for insufficient information, or when Spinal received no EOB on a claim it submitted. These employees further testified that the Aetna representatives they spoke with were generally unhelpful in addressing their concerns, and they eventually stopped calling Aetna about unpaid claims.

33.     Exemplar Claim 2004-11, one of the eleven exemplars remaining, was filed in 2004 on behalf of Patient RP. Ex. 5. Spinal received an EOB in December 2004 which stated that the claim was being denied because "[t]his service is not covered under the member's plan." Id. Patient RP's plan required a referral from a primary care physician in order to receive coverage for services provided by a specialist. Ex. 6 at 524. There is no evidence that a referral was ever issued, let alone received by Aetna. Patient RP's plan required exhaustion of administrative review procedures before bringing suit on a claim, Ex. 6 at 556, but the denial of

Patient RP's claim was not appealed. Patient RP's plan also contains an anti-assignment clause. Id. at 668.

34.    In 2004, Aetna continued the investigation it had opened in 2003. Ex. 138 at 787-90. Investigation records show that Aetna continued to have at least some Spinal claims reviewed by Aetna medical directors. Id. at 787. In February of 2004, the SIU investigator again accessed Spinal's website and noted that Spinal still held itself out as providing second opinions. Id.

35.    In the spring of 2004, Aetna calculated that it had wrongfully paid more than $100,000 to Spinal in the previous ten months on claims that should have been denied. Id. at 788. That summer, another overpayment figure was calculated to be in excess of $400,000. Id.; Ex. 117. In July, an SIU investigator drafted an overpayment letter to Spinal seeking repayment of the latter amount. Ex. 138 at 788; Ex. 117. The letter explained that "[i]n most cases, a second interpretation of an x-ray is not medically necessary . . . and, thus, would not be covered under Aetna plans. Aetna Medical Directors reviewed numerous claims and[,] in each case, determined that the services were not medically indicated." Ex. 117 at 359.

36.    Aetna addressed the letter to "Spinal Imaging Association," id., which is not the correct name of Spinal. I find, however, that the letter is in reference to Spinal. It discussed Spinal's business, and Spinal employees responded to it.

37.    Aetna mailed the letter to 24-A Norfolk Ave., South Easton, Massachusetts. Id. Dr. Abelson testified that Spinal moved out of the 24-A Norfolk Avenue address in 1999, relocating to 5 Norfolk Avenue, South Easton, Massachusetts, where it remained in 2004. These two locations are several buildings apart in a suburban office park.

38.     In his deposition, Dr. Abelson was asked "is that a correct mailing address, 24-A Norfolk Ave., South Easton, Mass.?"  Abelson Dep. 96:10-96:11, Oct. 23, 2013.  He responded "Yes, it is."  Id. at 96:12.  Dr. Abelson did not correct this testimony in an errata sheet.  During his trial testimony, Dr. Abelson denied that 24-A Norfolk Avenue was the correct mailing address of Spinal in 2004 and offered no explanation for his deposition testimony.

39.     Both Dr. Abelson and Dr. Henry, to whom the letter was addressed, deny receiving the letter and deny knowing of its contents prior to this litigation.  As to Dr. Abelson, I find this testimony incredible.  As to Dr. Henry, I find he does not now recall a letter he received in 2004 to which he briefly responded.

40.     The SIU investigation notes and a copy of the letter indicate that it was mailed on July 22.  Ex. 117 at 359; Ex. 138 at 788.  According to Ms. Lajoie, Aetna at this time frequently mailed overpayment letters by UPS ground service resulting in next-day delivery in the Northeast.

41.     The investigation notes also reflect that on July 23, 2004, the day after Aetna mailed the letter, Marla Parker, who plaintiffs stipulate was the office manager of Spinal at the time, called the SIU investigator and discussed Spinal's business model and the claims Spinal had filed with Aetna.  Ex. 138 at 788.  One month later, in August, the same records reflect that Dr. Henry called the SIU investigator and spoke about the overpayment amount referenced in the letter.  Id.

42.     As a result of these conversations, the investigator requested a report from another division within Aetna that detailed the claims filed by Spinal.  Id.  In reviewing this report, the investigator noted that some of Spinal's claims were not consistent with Dr. Henry's description of Spinal's business.  Id.  This report resulted in a new overpayment letter drafted on September

3rd and mailed on September 7th to the same address as the first letter.  Id.; Ex. 46.  The new letter requested repayment of more than $485,000 of reimbursements that Aetna believed it had paid in error.  Ex. 46; Ex. 138 at 788.  The September letter stated: "Aetna does not provide benefits for multiple reads of diagnostic tests[] [and] [o]ur research indicates that Spinal Imaging, Inc[.] provides second opinions on x-rays."  Ex. 46 at 386.

43.     As with the first letter, investigation records indicate that the following day, the investigator received separate phone calls from Dr. Henry and Dr. Abelson, both of whom disputed Aetna's conclusion that Spinal rendered second opinions.  Ex. 138 at 789.  In response to these conversations, the Aetna investigator called five chiropractors who referred films to Spinal and asked about the x-rays they referred.  Id.  The investigator received responses from three of the five chiropractors, all of whom said they sent films to Spinal for second opinions. Id.

44.     I specifically find that the contemporaneous responses by Spinal, Dr. Abelson, and Dr. Henry to Aetna's overpayment letters, and the reasons advanced therein, support my finding that Spinal and Dr. Abelson received and knew about the letters.

45.     The SIU investigator also received confirmation from Dr. Frank, an Aetna medical director who was a chiropractic doctor, that chiropractors were trained to read x-rays and that second reads of chiropractic x-rays were not medically necessary in most cases.  Id.

46.     In September of 2004, the investigator sent overpayment letters to several referring chiropractors on the theory that, if the referring chiropractor had only taken the x-ray, but billed under a global code, payment on the portion of the charge compensating for interpreting the x-ray would have been improper.  Id.  The investigator did this to determine who was actually making the initial interpretation of the x-rays sent to Spinal.  Id.  Investigation

15

records reveal that at least two of the referring providers responded, and both stated that they sent x-rays to Spinal for second opinions after having completed the initial interpretations themselves. Id.; Ex. 113 at 389.

*2005*

47.    By the beginning of 2005, Spinal knew Aetna had declined to pay almost 3,000 of its claims submitted in the preceding two years, yet it continued. Ex. 123. That year, Spinal billed Aetna for 2,130 more claims, each arising out of a new individual referral. Id. Aetna paid only 182 of these claims, or about eight percent. Id. These claims were denied due to the failure to obtain a required referral, and Aetna having been billed by and having paid another provider for the claim, among other reasons. Ex. 125. Again, there were no formal appeals by Spinal.

48.    Exemplar Claim 2005-24, one of the eleven exemplars remaining, was filed in 2005 on behalf of Patient EN. Ex. 10. Spinal received an EOB in January 2006 which stated that the claim was being denied because "[t]he information received is insufficient for claim processing." Id. Patient EN's plan required exhaustion of administrative review procedures before bringing suit on a claim, Ex. 11 at 901, but the denial of Patient EN's claim was not appealed.

49.    In 2005, Aetna's SIU continued the investigation it had opened in 2003. Ex. 138 at 790-93. In January, the SIU investigator sent letters to chiropractors who referred films to Spinal with the apparent purpose of again following up on Spinal's claim that it did not perform second interpretations of x-rays. Id. at 790; Exs. 74-77. The letters inquired whether the films were referred to Spinal for an initial interpretation or a second opinion. See, e.g., Ex. 74 at 546. Follow-up letters were sent in April of 2005. Ex. 138 at 790; Exs. 79-80. At least three referring

chiropractors responded to these questionnaires, and all stated that they referred films to Spinal for second opinions.  Exs. 130-32; Ex. 138 at 790.

50.    In September, Aetna calculated that, for certain billing codes, it had paid Spinal more than $300,000 on claims that were not properly payable.  Ex. 138 at 791-92.  A third repayment letter was sent to Spinal on October 14th requesting repayment of that amount and reiterating that "your office is submitting bills for services [that] have already been performed, making the second reading unnecessary."  Ex. 47; Ex. 138 at 792.  The letter further recited that enclosed was "a copy of Aetna's Reimbursement Policy further detailing our position."  Ex. 47. Again, this letter was sent to the same address as the 2004 overpayment letters.  Id.  This was the last of three overpayment letters sent to Spinal.  See id.; Ex. 46; Ex. 117.

51.    Two weeks later, on November 2nd, Dr. Abelson called the SIU.  Ex. 138 at 792. After a few missed calls, the investigator spoke to Dr. Abelson, who repeated his position that Spinal did not provide second opinions.  Id. at 793.  When confronted with the results of the questionnaires indicating that referring providers were, in fact, completing an initial interpretation of the x-rays, Dr. Abelson suggested that Aetna obtain the x-ray reports of the referring chiropractors, which he suggested would show that the referring doctors were not completing a sufficient initial interpretation of the films to warrant reimbursement.  Id.

52.    The three repayment letters sent in 2004 and 2005 made clear to Spinal what it already knew—namely, that Aetna would not pay Spinal to read x-rays that Aetna previously had paid another chiropractor to read.  The letters further communicated that Aetna understood that Spinal performed second opinion interpretations of chiropractic x-rays previously interpreted and billed for by other chiropractors—which Spinal also already knew.  Thus, Spinal clearly knew that Aetna was denying all of its bills for this reason (except, perhaps, for a few individual

bills paid inadvertently) and would continue to do so. Notably, while the investigator suggested he would follow up with Dr. Abelson in their conversation after the third letter, he apparently did not. The record is plain, however, that neither Dr. Abelson nor Spinal ever reached out to the investigator to further address his findings. They did not do so for the reasons set forth above. See ¶¶ 18-19, supra.

*2006-2008*

53.     Spinal concedes that an investigator from Blue Cross Blue Shield visited their offices in 2006 following up on the billing issue discussed above. According to Dr. Abelson, the investigator advised Spinal that Blue Cross would not pay Spinal to read x-rays if the referring provider already had billed using a global code, which encompasses both taking and interpreting the x-ray. The investigator also instructed Spinal to open a new company to assist in changing the behavior of referring providers. Despite this recommendation, neither Spinal nor Dr. Abelson made any changes until 2008. In the meantime, Spinal continued accepting referrals of Aetna insureds and submitting claims on their behalf.

54.     For the years 2006-2008, inclusive, Spinal filed between 1,000 and 2,000 claims annually with Aetna. Ex. 123. Of these claims, Aetna paid only sixteen of the approximately 5,000 filed. Id. Still, Spinal failed to appeal the vast majority of claims denied by Aetna.[5] Spinal received EOBs in almost every case stating that the claims were denied. Sometimes the EOB stated a reason for denying the claim, reasons which were frequently the same as those given for denials in earlier years. Other times the EOB gave no reason and stated that a letter would follow. No such letters ever followed.

---

[5] Mrs. Abelson testified that she filed only five formal appeals with Aetna and that they all were filed in 2010 or thereafter. Ms. Lajoie testified that thirty to forty formal appeals were filed for Spinal and RD claims, with most being filed around 2010. She further testified that, to her recollection, the appeals from 2003 to 2008 were submitted by insureds and not by Spinal.

55.     Exemplar Claims 2006-4 and 2006-22, both included in the eleven remaining exemplars, were filed during this period.  Exemplar Claim 2006-4 was filed in 2006 on behalf of Patient DW.  Ex. 14.  Although the record contains EOBs sent to Patient DW and the referring chiropractor, there is no EOB on file that was sent to Spinal.  See id.  The EOB to the referring chiropractor reflects that the referring doctor was paid for an "x-ray exam of [the] lower spine."  Id. at 661.

56.     Exemplar Claim 2006-22 was filed in 2006 on behalf of Patient JS.  Ex. 16.  Spinal received an EOB in April 2006 which stated that the claim was being denied because Aetna was "previously billed by and [] paid another provider for this service."  Id. at 222.  Patient JS's plan required a referral from a primary care physician in order to receive chiropractic treatment.  Ex. 18 at 287.  There is no evidence that a referral was ever issued, let alone received by Aetna.

57.     In January of 2006, the SIU investigator followed up on Dr. Abelson's suggestion that Aetna obtain the x-ray reports of referring providers in order to ascertain whether they were, in fact, completing initial interpretations of x-rays.  Ex. 138 at 793.  Letters were sent to six referring providers attaching questionnaires and requesting the medical records of patients whose films were referred to Spinal.  Id.; Exs. 82-87; Exs. 133-35.  Notes of the investigation indicate that at least four of the referring providers responded.  Ex. 138 at 793.  Two of those responding stated that they referred to Spinal for second opinions, and one stated it referred to Spinal for initial interpretations.  Id.  One questionnaire evidently was returned blank.  Id.  Given the inconsistent results of this round of questionnaires, the SIU decided not to further pursue repayment, but left the system of flags in place to deny claims unless there was a showing of medical necessity.  Id.

58.     In 2008, as a result of his 2006 conversation with the Blue Cross Blue Shield investigator, Dr. Abelson formed RD, organized under the laws of Massachusetts.  At all relevant times, RD had two shareholders—Dr. Abelson and Spinal.

59.     In 2008, Spinal ceased operations and was replaced by RD.  At this time, Dr. Abelson changed the promotional materials and assignment form that had been used by Spinal. The assignment form used by RD eliminated the "second opinion" language, and instead stated that the patient's x-rays were being submitted "for primary radiological interpretation and report by a specialist."  See, e.g., Ex. 19.  Similarly, a RD brochure removed any references to second opinions and specifically instructed referring doctors to bill insurance companies using the "-TC" modifier, which indicates that the referring provider took but did not interpret the x-ray.  Ex. 43. The materials, however, still indicated that the reports created by RD could be submitted to insurers in addition to the referring chiropractors' reports.  Id.

*2009-2012*

60.     Upon the formation of RD, Dr. Abelson operated his business only through RD. Other than the name, the assignment form, the brochure, and the website, everything else remained the same.  RD maintained the same offices, the same practices, and the same employees as Spinal.  Chiropractors who had referred films to Spinal made up some significant portion of the chiropractors who referred films to RD.  Thus, all of the findings made regarding Spinal apply to RD, except as noted.

61.     I find that neither Dr. Abelson, nor any other employee of Spinal or RD took any steps, beyond changing the language on the website, assignment form, and promotional materials, to ensure that referring chiropractors billed only for the technical component and not

for interpreting the x-ray. Nor did they decline to perform an interpretation of an x-ray previously interpreted and billed for by the referring chiropractor.

62. The remaining exemplar claims were submitted by RD after its formation in 2008. Exemplar Claim 2009-2 was filed in 2009 on behalf of Patient SE. Ex. 20. RD received an EOB which stated that the claim was being denied and that, "[i]f there is no specific denial reason shown, you will receive a separate letter of explanation." Id. at 165. No specific denial reason was shown, id., and no separate letter was sent. Patient SE's plan did not cover chiropractic care, with the exception of manual manipulation of the spine. Ex. 23 at 362.

63. Exemplar Claim 2009-22 was filed in 2009 on behalf of Patient CS. Ex. 25. RD received an EOB in October 2009 which stated that the claim was being denied because Aetna was "previously billed and [it] paid another provider for this service." Id. at 448. Patient CS's plan required exhaustion of administrative review procedures before bringing suit on a claim, Ex. 26 at 571, but the denial of Patient CS's claim was not appealed. Patient CS's plan provided limited coverage of chiropractic care, and did not state that chiropractic x-rays were a covered service. Id. at 493.

64. Exemplar Claim 2010-4 was filed in 2010 on behalf of Patient AC. Ex. 28. RD received an EOB in August 2010 which stated that the claim was being denied and that, "[i]f there is no specific denial reason shown, you will receive a separate letter of explanation." Id. at 024. No specific denial reason was shown, id., and no separate letter was sent.

65. Exemplar Claim 2011-23 was filed in 2011 on behalf of Patient FH. Ex. 33. RD received an EOB in January 2011 which stated that the claim was being denied because the "service is not covered under the member's plan." Id. at 374. Patient FH's plan limited coverage for chiropractic care to manual manipulation of the spine. Ex. 34 at 392.

66.     Exemplar Claim 2011-25 was filed in 2011 on behalf of Patient KK.  Ex. 36.  RD received an EOB in January 2012 which stated that the claim was being denied because Aetna was "previously billed and [it] paid another provider for this service."  Id. at 564.

67.     Exemplar Claim 2012-19 was filed in 2012 on behalf of Patient DB.  Ex. 39.  RD received an EOB in December 2012 which stated that the claim was being denied because Aetna was "previously billed and [it] paid another provider for this service."  Id. at 800.

68.     The SIU reopened its investigation into claims filed by Spinal and now RD in 2009, when the first of the two lawsuits constituting this matter was filed.  The SIU investigation file contains the RD promotional materials discussed in the preceding paragraphs.  The materials, undated but copyrighted 2011, still contained language that the reports authored by RD could be submitted to insurers in addition to the reports authored by the referring providers.  Ex. 43.  The SIU also obtained RD assignment forms, which no longer contained the reference to "second opinion" evaluations.

69.     I find that the failure of RD and Dr. Abelson to take any steps to ensure referring chiropractors billed only for the technical component of an x-ray or to ensure that RD did not interpret x-rays if the referring chiropractor previously billed for that service arose out of a concern that doing so would directly or indirectly result in a significant decrease in referrals from these chiropractors.  RD's business model, just like Spinal's, depended upon referring chiropractors sending every x-ray to RD at no cost.

70.     At no time did Dr. Abelson or RD advise Aetna that RD's business model or the services they rendered differed from Spinal's.

III.     CONCLUSIONS OF LAW

The only counts of plaintiffs' complaints left to be resolved are claims for violations of

Chapter 93A, section 11.  Plaintiffs' breach of contract and negligence counts were dismissed on

summary judgment.[6]  Doc. No. 153.

A.     Elements of a Chapter 93A, § 11 Claim

In order to prove a violation of Chapter 93A, section 11, plaintiffs must prove the use or

employment by Aetna of an unfair method of competition or an unfair or deceptive act or

practice declared unlawful by section two of that chapter.  Mass. Gen. Laws ch. 93A, § 11;

Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 56 (1st Cir. 1998).  Plaintiffs must also

establish a loss of money or property caused by the violative conduct.  Mass. Gen. Laws ch. 93A,

§ 11; Arthur D. Little, 147 F.3d at 56.

"Massachusetts courts, in considering whether a particular act or practice violates the

unfairness prong of Chapter 93A: 'look to (1) whether the practice . . . is within at least the

penumbra of some common-law, statutory or other established concept of unfairness; (2)

whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes

substantial injury to consumers (or competitors or other businessmen).'"  Mass. Eye & Ear

Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 69 (1st Cir. 2009) (quoting Mass. Eye &

Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005)).  "The 'crucial

factors' in an unfairness inquiry are 'the nature of [the] challenged conduct and [] the purpose

---

[6] Plaintiffs have raised the issue that their claims for digitizing x-rays were also denied by Aetna, and have argued that such denials were inappropriate as referring providers lack the technology or ability to complete the digitization of films, and therefore Spinal's digitization claims could not be denied on the basis of being a repetitious service. As an initial matter, the Court notes that there is no breach of contract claim currently pending in this case.  Further, plaintiffs have cited no evidence, in the form of insurance policies, Aetna claim processing policies, or otherwise, to show that digitizing is an independently reimbursable activity, separate and apart from taking and interpreting an x-ray.  As such, the fact that plaintiffs were also not paid on their claims of digitizing x-rays does not give rise to an independent Chapter 93A claim.

and effect of that conduct.'" In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156,

184-85 (1st Cir. 2009) (quoting Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d

435, 438 (Mass. 1995)).  Not every "unseemly business practice[]" gives rise to liability under

section 11; as between commercial enterprises, "the objectionable conduct must attain a level of

rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of

commerce."[7] Id. at 185 (quoting Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d

26, 41-42 (1st Cir.1998)).  "[A] practice is 'deceptive,' for purposes of [Chapter 93A], if it could

reasonably be found to have caused a person to act differently from the way he [or she]

otherwise would have acted."  Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 486 (Mass. 2004)

(internal quotation marks omitted).

        Here, plaintiffs advance theories of liability premised on violations of Chapter 176D of

the Massachusetts General Laws—which prohibits unfair or deceptive practices in the business

of insurance—to, in turn, establish violations of Chapter 93A.  Chapter 176D does not grant a

private right of action, and Chapter 93A, section 11, unlike section 9 of that chapter, has not

incorporated violations of Chapter 176D, section 3 as per se violations.  See M. DeMatteo

Constr. Co. v. Century Indem. Co., 182 F. Supp. 2d 146, 159-60 (D. Mass. 2001).  Accordingly,

a plaintiff proceeding under Chapter 93A, section 11 may point to a violation of Chapter 176D as

evidence of a violation of section 11, but, in the end, must prove that a defendant's conduct

---

[7] Before Propac, 648 N.E.2d 435, "rascality" was a clear touchstone for determining whether conduct constituted "unfair practices" violating section 11.  See J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc., 365 F. Supp. 2d 119, 143 n.13 (D. Mass. 2005).  Another judge of this district has noted that the Supreme Judicial Court has evinced some discomfort with that formulation.  See id. (citing Propac, 648 N.E.2d at 438).  As this quotation demonstrates, however, the First Circuit has continued, as recently as 2009, to consider rascality in determining liability under section 11.  Regardless of whether the Supreme Judicial Court's reservations are indicative of a substantive change to the standard for determining liability, it is of no significance in this case, as Aetna's conduct here was not unfair under any definition.

constituted an unfair or deceptive business practice in violation of Chapter 93A, section 2.

Peterborough Oil Co. v. Great Am. Ins. Co., 397 F. Supp. 2d 230, 244 (D. Mass. 2005).

Each plaintiff has the burden of proving "not only that the acts were unfair or deceptive, but also that it suffered a 'loss of money or property' under Mass. Gen. Laws ch. 93A, § 11." Arthur D. Little, 147 F.3d at 56. Plaintiffs have advanced three theories to support a finding of a violation of Chapter 93A: two premised on violations of Chapter 176D, and one based directly on allegations of unfair business practices prohibited by Chapter 93A, section 2.

B. Reasonable Investigation

Plaintiffs' first theory of Chapter 93A liability arises from an alleged violation of Chapter 176D, section 3(9)(d), which defines as an unfair claim settlement practice "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information." Mass. Gen. Laws ch. 176D, § 3(9)(d). Plaintiffs argue that Aetna summarily rejected all of their claims and, by not considering each claim submitted by Spinal and RD independently, violated this provision of the statute.

As stated in the Court's ruling on summary judgment, under Massachusetts law, recovery on a theory of inadequate investigation is limited to circumstances where, if an adequate investigation had been conducted, liability would have been reasonably clear. Behn v. Legion Ins. Co., 173 F. Supp. 2d 105, 113 (D. Mass. 2001); Gaffney v. AAA Life Ins. Co., 4 F. Supp. 2d 38, 40 (D. Mass. 1998). Thus, the exemplars for which Aetna has defenses to payment for the underlying claims are not recoverable under this theory, as liability for those claims would not have been reasonably clear. Gurnack v. John Hancock Mut. Life Ins. Co., 550 N.E.2d 391, 393 n.5 (Mass. 1990) (citing Van Dyke v. St. Paul Fire & Marine Ins. Co., 448 N.E.2d 357, 362 (Mass. 1983)). This application of Massachusetts law disposes of six of the eleven remaining

exemplars as to this theory, as each is subject to defenses to payment.  Three claims are not payable for nonreceipt of a required referral.  <u>See</u> Exs. 1-3 (claim and policy documents for exemplar 2003-7); Exs. 4-6 (same for exemplar 2004-11); Exs. 16-18 (same for exemplar 2006-22).  An additional three exemplars are not payable due to chiropractic x-rays not being a covered service.  <u>See</u> Exs. 19-23 (claim and policy documents for exemplar 2009-2); Exs. 24-26 (same for exemplar 2009-22); Exs. 32-34 (same for exemplar 2011-23).

As to the remaining five exemplar claims, I find that the investigation into Spinal and RD's claims was reasonable.  I accept, for the purposes of this opinion, that Aetna did not individually investigate each of plaintiffs' claims.  However, after a reasonable investigation, Aetna reasonably determined that Spinal and RD provided one medical service—a second opinion review of chiropractic x-rays—which is never reimbursable in the absence of an individual determination of medical necessity, something never asserted by plaintiffs.  Chapter 176D generally requires an individualized investigation and determination on each claim.  <u>See</u> <u>Hopkins v. Liberty Mut. Ins. Co.</u>, 750 N.E.2d 943, 947-49 (Mass. 2001).  Nevertheless, in these unusual circumstances, Aetna was reasonable in treating all of plaintiffs' claims in like fashion.

Further, none of Aetna's conversations with Spinal employees provided Aetna with a basis to conclude that some of Spinal's claims were not, in fact, subject to Aetna's concerns.  When confronted with Aetna's conclusion that plaintiffs were providing second opinions, Dr. Abelson first argued that Spinal did not provide second opinions, which was disproved by the SIU's investigation, and second, that the referring chiropractors were committing fraud, to the extent the evidence showed that Spinal was providing second opinions.  Neither of these arguments would have indicated to Aetna that they needed to evaluate Spinal's claims

individually, as opposed to relying on its reasonable conclusion that Spinal's business model was constructed to provide second interpretations of x-rays.

Given this reasonable conclusion that Spinal was uniformly providing the same medical service, Aetna's investigation into Spinal was not unreasonable. Aetna's SIU had a litany of evidence that Spinal's business model centered around providing nonreimburseable second opinions. SIU investigators examined Spinal's promotional materials, which held Spinal out as providing second opinions; Spinal's use of billing codes, which indicated that plaintiffs were providing second opinions; and the responses of referring chiropractors, all but one of whom stated that they sent their x-rays to Spinal for second opinions.

While Aetna's investigation may not have been ideal, "[s]ection 3(9)(d) [of Chapter 176D] requires only reasonable investigation." Pediatricians, Inc. v. Provident Life & Accident Ins. Co., 965 F.2d 1164, 1172 (1st Cir. 1992). Neither Aetna's conclusion that all Spinal's claims could presumptively be treated alike nor the aggregate investigation into Spinal's claims was unreasonable. See Thomas v. Metro. Life Ins. Co., 40 F.3d 505, 511-12 (1st Cir. 1994) (holding investigation to be reasonable for the purposes of Chapter 176D even though the insurer might have been more thorough or taken more initiative); Pediatricians, 965 F.2d at 1172 ("A reasonable investigator need not necessarily investigate that which it considers irrelevant.").

The same conclusion applies to RD, which continued Spinal's business in all respects with the exception of its name and the language in some of its written materials. RD acted as Spinal had acted, and did nothing, other than make some minor changes to paperwork, to alter its behavior or the behavior of the referring chiropractors. Further, RD never advised Aetna that it

did business differently; thus, Aetna had no reason to view RD as anything other than Spinal under a different name.[8]  Accordingly, Aetna reasonably treated RD as it had treated Spinal.

Alternatively, even if the Court were to find that Aetna's conduct violated Chapter 176D—which it does not—it would not find a violation of Chapter 93A.  Looking at Aetna's conduct in investigating the claims, the evidence shows that Aetna investigated numerous Spinal and RD claims by contacting insureds, requesting information and medical records from referring providers, consulting Aetna medical directors, and reviewing Spinal and RD's promotional materials.  Aetna altered the contours of the investigation in response to Dr. Abelson's and other Spinal employees' responses to Aetna's conclusions.  After that investigation, Aetna arrived at the reasonable conclusions that Spinal and RD's business model invited chiropractors to refer second opinions that were not medically necessary, and that all Spinal and RD claims should be denied unless medical necessity could be shown.

Such is not the stuff of a Chapter 93A violation.  "An absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A-176D action based on unfair settlement practice."  Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 36 (1st Cir. 2007) (quoting Guity v. Commerce Ins. Co., 631 N.E.2d 75, 77-78 (Mass. App. Ct. 1994)).  The decision to deny claims without further investigation was founded on a reasonable conclusion based on evidence and was not the product of bad faith, nor was it orchestrated to deny benefits to which Aetna knew Spinal was entitled.  Thus, Aetna's conduct in investigating Spinal and RD's claims was not unfair and certainly did not rise to the level of immoral, unethical, oppressive, or unscrupulous behavior.  See Mass. Eye & Ear Infirmary, 552 F.3d at 69.

---

[8] In fact, Spinal changed its name at the suggestion of Blue Cross Blue Shield, and there is no evidence to show that Aetna knew of that advice or Spinal's purported motivation for changing its name.

C.     Providing a Prompt, Reasonable Explanation for Denying Claims

Plaintiffs' second theory of Chapter 93A liability arises from an alleged violation of Chapter 176D, section 3(9)(n), which defines as an unfair claim settlement practice "[f]ailing to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim."  Mass. Gen. Laws ch. 176D, § 3(9)(n).  Plaintiffs argue that Aetna, either by not informing Spinal or RD of the flags that had been placed on their claims, or by sending inaccurate EOBs, EOBs without explanation, or no EOBs at all, violated this provision.

The evidence establishes that Aetna sent EOBs to Spinal that gave various reasons for denials; that, for some claims, the EOBs had no explanation and referred to a letter to follow that never arrived; and that, for some claims, Spinal and RD never received EOBs.

For four of the eleven exemplars, the EOB recited that Aetna was "previously billed by and [] paid another provider for this service," or similar language.  See Ex. 16 (EOB for exemplar 2006-22); Ex. 25 (EOB for exemplar 2009-22); Ex. 36 (EOB for exemplar 2011-25); Ex. 39 (EOB for exemplar 2012-19).  This, in combination with the letters and conversations Aetna personnel had with Spinal employees, provided a reasonable and individual explanation of the basis in the insurance policy in relation to relevant facts for denying the claim.  See Pediatricians, 965 F.2d at 1172 (noting that where insurer's "stated position" on coverage applies in "straightforward manner" section 3(9)(n) "does not pose a particularly stringent requirement").  Additionally, for exemplar claim 2011-23, Spinal received an EOB that stated that the service was not covered by the member's plan when, in fact, that member's policy did not cover chiropractic x-rays.  See Ex. 33; Ex. 34 at 392.  As with the four claims above, this

satisfies the dictates of section 3(9)(n) as plaintiffs received an accurate EOB. See Pediatricians, 965 F.2d at 1172. This leaves six exemplar claims to address.

For five of the remaining six exemplars, the services were performed and the EOBs were sent, if any, after the receipt of at least two repayment letters from Aetna in 2004 and after several telephone conversations between an SIU investigator and Spinal employees which referenced the letters and Aetna's position on Spinal's claims. Those letters stated clearly and unequivocally that Aetna considered Spinal's business to be providing second interpretations of x-rays and that such second interpretations were not payable without an individualized showing of medical necessity. Although ordinarily an individual explanation for each claim would be expected, see Hopkins, 750 N.E.2d at 948-49, Aetna reasonably concluded that Spinal and RD were submitting a type of claim that was not payable. Moreover, Spinal and RD knew and understood Aetna's conclusion and the reason for the denials. Thus, the very purpose for the reasonable explanation requirement was satisfied here.

Regardless of whether this behavior constituted a violation of Chapter 176D, plaintiffs have not met their burden to prove a Chapter 93A violation because they cannot show that they were harmed by any violation. See Arthur D. Little, 147 F.3d at 56. After receipt of the repayment letters, plaintiffs were aware of the reason why virtually all of their claims were being denied. Thus, any deficiencies in the explanations provided by the individual EOBs did not harm plaintiffs because they already knew the explanation and were aware Aetna considered the reasoning to apply to all past, present, and future Spinal and RD claims.

There is, however, one exemplar claim, 2003-7, for which the EOB was received prior to the 2004 repayment letters, and the reason given in the EOB may not have been accurate and legitimate. As with the five claims described above, however, plaintiffs have not established

harm resulting from any deficiencies in the explanation for the denial of the claim. This is so because the claim was not otherwise payable. Although not cited in the EOB, the plan underlying this claim contained a referral requirement and there was no evidence that a referral was issued or received by Aetna. Ex. 3 at 493. Thus, even if they had received an EOB with an accurate explanation for the denial and used that explanation to appeal the denial, plaintiffs still would not be entitled to payment on the claim.

Apart from not receiving payment on the claim, plaintiffs have not established that they were harmed by the insufficient explanation in any other sense, such as being induced into continuing to do business with Aetna. The Court has found that by 2003, Plaintiffs were already aware, even before receipt of the repayment letters, that their claims were being denied due to referring chiropractors billing for interpreting the x-rays. Further, the overwhelming weight of the evidence establishes that, for years after plaintiffs became aware of the reason Aetna was denying virtually all of their claims, they continued to file thousands of claims with Aetna— claims that, from Aetna's clearly articulated perspective, were each equally not payable. Thus, plaintiffs cannot show that the failure to provide an accurate explanation on claim 2003-7 in any way caused them to incur a loss of money or property that they would not have otherwise incurred. See Mass. Gen. Laws ch. 93A, § 11; Tech Plus, Inc. v. Ansel, 793 N.E.2d 1256, 1263-65 (Mass. App. Ct. 2003). Accordingly, for this claim, plaintiffs have not satisfied their burden to show that they were harmed by any failure to promptly provide a reasonable explanation of the basis for denying the claim, and thus their Chapter 93A claim fails. See Arthur D. Little, 147 F.3d at 56.

D.    <u>Luring</u>

Plaintiffs' last theory of Chapter 93A liability arises from a general allegation that Aetna's claim settlement practices were unfair to Spinal and RD.  In their pre-trial memoranda and opening statement at trial, plaintiffs developed the theory that Aetna induced plaintiffs to continue providing their services by suggesting that their claims would eventually be paid, all the while knowing that it had no intention of ever paying any of plaintiffs' claims.

There is no evidence whatsoever that Aetna ever represented—or even hinted—that Spinal or RD's claims would be paid.  The evidence, in fact, shows just the opposite: an unrelenting stream of denials throughout the entire course of conduct relevant to these actions. Plaintiffs point to a single notation in the notes of Aetna's investigation which memorializes a conversation between an SIU investigator and Dr. Abelson following the receipt of the final repayment letter.  Ex. 138 at 793.  According to the note, Dr. Abelson told the investigator that he should get the radiological reports of the referring providers to substantiate their claims that they were providing the initial interpretation of the x-rays.  <u>Id.</u>  The note then states that the investigator will "look into the 1st opinion reports and then get back to Dr. Abelson."  <u>Id.</u>

While the notes reflect that the investigator did indeed look into the radiological reports of the referring providers, <u>id.</u>, there is no indication that the investigator ever responded to Dr. Abelson about this facet of the case, and Dr. Abelson testified that the investigator did not contact him with a response.  Accepting that the investigator communicated his intent to contact Dr. Abelson after investigating the claim, the failure to respond to Dr. Abelson does not support the inference that Aetna "lured" Spinal without some evidence that Aetna represented to Spinal that its past and future claims would be paid.  There is simply no such evidence of representations by Aetna to this effect anywhere in the record.  Moreover, Spinal and RD knew

by early 2003 that Aetna would not pay the type of claim they were submitting. Without

showing some misrepresentation on Aetna's behalf, there is no foundation to support plaintiffs'

Chapter 93A claim. See Baybank Middlesex v. 1200 Beacon Props., Inc., 760 F. Supp. 957,

970-71 (D. Mass. 1991) (granting summary judgment on Chapter 93A claim where there had

been no showing of any misrepresentation beyond "conclusory allegations and assertions").

       E.      <u>Non-Exemplar Claims</u>

During discovery, the Court determined that the use of exemplar claims, as opposed to

adjudicating all 12,000 claims involved in these suits, was the only fair and efficient manner to

resolve this action. See Doc. Nos. 84, 87. The Court ordered that the exemplars be determined

using a formula that ensured a fair cross-section of the 12,000 claims would be selected. See

Doc. No. 87 at 2. The parties were also able to augment the randomly selected claims with

claims of their choosing. Id. at 2. Neither party objected to proceeding in this manner until

plaintiffs' filing of a motion in limine on the eve of trial, Doc. No. 191, which the Court denied,

Doc. No. 192.

During trial, plaintiffs offered as evidence spreadsheets that grouped all 12,000 claims

into categories based on the type of EOB, if any, that Spinal or RD received for that claim. See

Doc. Nos. 193-94. These spreadsheets were objected to and not admitted into evidence on the

basis that they had not been properly disclosed to Aetna, and because they were not relevant to

the exemplar claims being tried. Even if those spreadsheets had been admitted and the Court had

considered the EOBs for all 12,000 claims, the Court's determination as to whether Aetna

violated either Chapter 176D or Chapter 93A would not change. The findings of fact apply

equally to all of the bills. The reasoning set forth in the preceding paragraphs as to the

substantive allegations of failure to reasonably investigate, failure to provide reasonable

explanations, and luring applies equally to exemplar claims and non-exemplar claims alike.

IV.    <u>CONCLUSION</u>

        In light of these findings of fact and conclusions of law, the Court GRANTS judgment

for Aetna on plaintiffs' Chapter 93A claims for the remaining exemplars. [9]


                                SO ORDERED.

                                 /s/ Leo T. Sorokin
                                Leo T. Sorokin
                                United States District Judge

---

[9] In light of the Court's rulings, the Court need not address Aetna's motion in limine insofar as it asserted that the assignments obtained by Spinal did not encompass the right to raise the Chapter 93A claim of a third party. Similarly, having made comprehensive findings of fact, the Court declines to address Aetna's motion for a judgment on partial findings as to either the assignment issue or the sufficiency of plaintiffs' evidence.